UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TODD LAWRENCE LAVERE,

        Plaintiff,

  v.            7:12-CV-531

MICHAEL J. ASTRUE
Commissioner of Social Security,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## **DECISION and ORDER**

Plaintiff Todd Lavere brings this suit under § 205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability and supplemental security benefits.

**I. FACTS**

  a. Procedural History

On March 5, 2010, the Social Security Administration ("Administration") denied Plaintiff's claim for disability benefits. R. at 56. On March 23, 2011, Administrative Law Judge Fein ("ALJ") held a hearing regarding the claim, wherein Plaintiff testified. R. at 32-54. On June 8, 2011, the ALJ delivered an unfavorable decision to Plaintiff. R. at 16-27. On January 19, 2012, the Appeals Council denied Plaintiff's request for a review of the ALJ's

decision. On March 23, 2013, Plaintiff filed a Complaint for judicial review of the final decision from the Commissioner of the Administration. Dkt. No. 1.

b. Medical History[1]

On May 13, 2009 Plaintiff reported to Dr. Williams that he had bumped his left ankle on a ladder. R. at 226. Dr. Williams noted soft tissue swelling and aching. R. at 226. Dr. Williams put a basketweave strap on Plaintiff's ankle and noted he was taking a prescription pain medication. R. at 226.

On May 21, 2009, Dr. Williams noted that Plaintiff's ankle was much worse, he was barely able to walk, "the EDB brevus muscle belly was extremely inflamed", along with other findings. R. at 225. Dr. Williams did not observe fractures in the x-rays taken, but noticed joint space widening. R. at 225. Dr. Williams ordered blood work and gave Plaintiff a forefoot compressive dressing. R. at 225.

Plaintiff was admitted to St. Joseph's Hospital in Syracuse, NY on May 27, 2009, after being referred by Dr. Kellogg. R. at 227. He was discharged on June 16, 2009, with a principal diagnosis of left leg ischemia, and secondary diagnoses of diabetes mellitus type 2, hypertension, metabolic syndrome, sleep apnea, right internal carotid occlusion with dissection, history of upper extremity deep vein thromboses, heparin induces thrombocytopenia, and alcoholism. R. at 227.

While at St. Joseph's, Plaintiff was seen by Dr. Semel, where it was found Plaintiff needed an angiogram and possible thrombolysis. R. at 227. Plaintiff was then taken to interventional radiology, and returned everyday for follow up thrombolysis. R. at 227. On

---

[1] Plaintiff's Medical History as set forth here is limited to what is relevant to the issues presented on appeal from the decision of the ALJ.

- 2 -

June 2, 2009, Plaintiff lost all pulses in his left lower leg, which also became pale. R. at 228. He was taken to the emergency room with Dr. Riley, Dr. Zama, and Dr. Carlin, who conducted a left lower extremity embolectomy, two compartment fasciotomy, popliteal and anterior tibial exposure with on table aniogram and an anterior tibial and popliteal artery patch angioplasty, and also a popliteal artery to saphenous vein bypass with reverse saphenous and vein graft. R. at 228. After Plaintiff's condition worsened, Dr. Riley conducted a left leg below the knee amputation. R. at 228. It was noted that Plaintiff had heparin induced thrombocytopenia, and was given Relfludan. R. at 288. Plaintiff was also prescribed Coumadin, among various other medications. R. at 228. Plaintiff was discharged to Samaritan Medial Center Acute Rehab Center in Watertown, NY in stable condition. R. at 228.

Plaintiff was admitted to Samaritan Medical Center on June 18, 2009, and discharged on June 26, 2009 in stable condition. R. at 256-57. Plaintiff's discharge diagnoses were "late effect left transtibial amputation, metabolic syndrome/diabetes mellitus, hypertensive cardiovascular disease, history of alcohol abuse, acute vascular occlusion/rule out hypercoaglable, state/coumadin therapy, hyperlipidemia with low HDL, elevated liver enzymes, history of smoking, intertrigo, actue blood loss anemia, and borderline hyponatremia. R. at 256. It was noted that Plaintiff's residual limb was "coming along excellent." R. at 256. Plaintiff underwent an intensive multidisciplinary rehabilitation program, and was found safe to return home by occupational therapy. R. at 256. Plaintiff was discharged with multiple medications. R. at 257-58.

On June 29, 2009, Plaintiff saw Bonnie L. Servage, A.N.P. at Watertown Internists who went over Plaintiff's medical history and prescriptions. R. at 339.

On June 30, 2009, Plaintiff saw Bonnie L. Servage, A.N.P. who noted Plaintiff was given a commode, folding walker, and transfer wheelchair when he was discharged from the hospital. R. at 338. On June 30, 2009, Plaintiff saw Dr. Riley who noted Plaintiff's stump was swollen but healing well. R. at 323. Dr. Riley prescribed Augmentin for mild erythema and probable cellulitis in the stump. R. at 323.

On July 14, 2009 Plaintiff followed-up with Dr. Riley, who removed staples from Plaintiff's incision, and started Plaintiff wearing a shrinker in anticipation of use of a prosthetic for ambulation. R. at 321.

On August 8, 2009, Dr. Riley opined that Plaintiff ". . . has begun walking with a prosthetic and is doing well. He continues to require Lortab for occasional pain . . . [h]is incisions are well healed and he is doing well with his prosthetic." R. at 320.

Plaintiff was seen on August 10, 2009 for diabetic instructions. R. at 336.

On September 1, 2009, Plaintiff saw Dr. Kellogg who reviewed Plaintiff's medications. R. at 334. Plaintiff reported taking Vicodin 1-2 times a day for the wear on his stump from his prosthetic device and phantom limb discomfort. R. at 334.

Plaintiff was given a new prescription for Chantix on September 8, 2009.

On September 22, 2009, Plaintiff saw Ann LePine, A.N.P, where he complained of left knee pain. R. at 332. It was noted Plaintiff was not taking his Coumadin as directed. R. at 332. Subtherapeutic INR was noted, likely due to "medical noncompliance." R. at 332. Plaintiff was instructed on correct dosages of Coumadin. R. at 332.

Plaintiff was seen multiple times by Watertown Internists throughout the fall and winter of 2009, and was prescribed Coumadin and Vicodin R. at 329-31.

On January 14, 2010, Plaintiff saw Dr. Kellogg who noted Plaintiff had lost about twenty pounds. R. at 325. Dr. Kellogg reported that Plaintiff "had been walking more, has been a lot more active including building a garage." R. at 325. Plaintiff reported to Dr. Kellogg that his prosthesis causes him discomfort, and asked for a referral to a physical therapist, and continued medications for pain. R. at 325. Plaintiff feels well refreshed in the morning, and reported being compliant with his CPAP. R. at 325. Plaintiff reported to Dr. Kellogg he had a dilated eye exam a month prior, and was told there was no retinopathy. R. at 325. Dr. Kellogg opined that Plaintiff would need insulin in the near future, was given a new prescription for Glimepiride, and was continued on his usual medications. R. at 326.

On January 20. 2010, Plaintiff saw Nancy Spicer, MS, RN-C, ANP, at Watertown Internists. It was noted that Plaintiff's diabetes was doing "pretty well," but that stress may be contributing to "increasing glucoses," and was prescribed Levemir pens. R. at 323.

On March 4, 2010, J. Godbey completed a physical residual functional capacity assessment. R. at 438. Plaintiff's primary diagnosis was left leg amputation, with a secondary diagnosis of diabetes. R. at 438. Godbey opined that Plaintiff could occasionally lift 20 pounds, frequently lift/carry 10 pounds, stand/walk for about 6 hours of an 8 hour work day, sit for about 6 hours for an 8 hour work day, and push and pull unlimited. R. at 439. It was noted that Plaintiff complained of pain when his leg was in use, but is not involved in PT and was told by doctors to continue to use his leg a little more daily. R. at 439. It was also noted that "claimant is currently engaging in SGA (substantial gainful activity) . . . and states . . . that he is currently receiving $715.00 every two weeks from his sales job . . ." R. at 439 (parenthetical added). Godbey also stated that "[a]s the claimant is currently engaged in

substantial gainful employment he is not allowed benefits."[2] R. at 440. Plaintiff was found to have no manipulative, visual, communicative, or environmental limitations. R. at 440-41.

An additional unsigned and undated residual functional capacity assessment is included in the record, which Plaintiff, himself, indicated that he completed. R. at 459-66; Pl. Mem. at 5. This residual functional capacity assessment states that Plaintiff can occasionally lift/carry 20 pounds, frequently lift/carry 25 pounds, stand/walk less than 2 hours in an 8 hour work day, sit less than 6 hours in an 8 hour work day, and push and/or pull limited in lower extremities. R. at 460.

Available records indicate Plaintiff was seen at Innovative Physical Therapy Solutions from April 5, 2010 to July 27, 2010. R. at 449-57. On June 8, 2010, Plaintiff reported that he was very sore, and had played 18 holes of golf on Memorial Day. R. at 452. On June 17, 2010, Plaintiff reported that he had significant pain, but had been on is feet in the garage all day the day before. R. at 451. On July 27, 2010, Plaintiff reported that he has played golf, and "felt tense" afterwards. R. at 449. Plaintiff's progress varies throughout the report, however on July 20, 2010, it was noted that Plaintiff's "legs feeling good; huge difference now from when started; it doesn't throb as much and able to wear leg longer." R. at 450. Additionally, on July 27, 2010, Plaintiff reported to his physical therapists that he always has pain at the end of the day, and that he has stabbing pain his first few steps, which then go away. R. at 449. It was noted that Plaintiff wears his prosthetic 6-8 hours per day. R. at 449.

---

[2] Plaintiff testified that he was contacting contractors through December after his amputation, after which Plaintiff did not work. Plaintiff further testified that his employer continued to pay him through what Plaintiff believes was March 7, 2010.

- 6 -

On March 30, 2011, Dr. Kellogg opined that Plaintiff suffers from 95% loss of his leg that has suffered the amputation. R. at 467-68. Dr. Kellogg noted that although Plaintiff complains of pain in his right foot, it "appears to be essentially 100% resolved at this time," and it cannot be determined at the present time if the pain in the right leg was a result of overuse due to the injury of the left leg. R. at 468.

## II.  STANDARD OF REVIEW

The court's review of the Commissioner's determination is limited to two inquiries. *See* 42 U.S.C. § 405(g). First, the court must determine whether the Commissioner applied the correct legal standard. See Tejada v. Apfel, 167 F. 3d 770, 773 (2d Cir.1999); Balsamo v. Chater, 142 F. 3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F. 2d 8, 9 (2d Cir.1990); Shane v. Chater, 1997 WL 426203, at *4 (N.D.N.Y. July 16, 1997) (Pooler, J.) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). Second, the court reviews whether the Commissioner's findings are supported by substantial evidence within the administrative record. See Tejada, 167 F. 3d at 773; Balsamo, 142 F. 3d at 79; Cruz, 912 F. 2d at 9; Rutherford v. Schweiker, 685 F. 2d 60, 62 (2d Cir.1982). The Commissioner's finding will be deemed conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g); see also, Perez, 77 F. 3d at 46; Rivera v. Sullivan, 923 F. 2d 964, 967 (2d Cir. 1991). In the context of Social Security cases, substantial evidence consists of "'more than a mere scintilla'" and is measured by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). Although the reviewing court must give deference to the Commissioner's decision, the Act is ultimately "'a remedial statute which must be liberally

applied; its intent is inclusion rather than exclusion." <u>Vargas v. Sullivan</u>, 898 F. 2d 293, 296 (2d Cir. 1990) (quoting <u>Rivera v. Schweiker</u>, 717 F. 2d 719, 723 (2d Cir. 1983)) (internal quotation marks omitted.) Where the record supports disparate findings and provides adequate support for both the plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. <u>See</u> <u>Quinones v. Chater</u>, 117 F. 3d 29, 36 (2d Cir. 1997) (citing <u>Schauer v. Schweiker</u>, 675 F. 2d 55, 57 (2d Cir. 1982)); <u>Alston v. Sullivan</u>, 904 F. 2d 122, 126 (2d Cir. 1990).

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result i death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The administrative regulations established by the Commissioner require the ALJ to apply a five-step evaluation to determine whether an individual qualifies for disability insurance benefits. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>see</u> <u>also</u> <u>Williams v. Apfel</u>, 204 F. 3d 48, 48–49 (2d Cir.1999); <u>Bush v. Shalala</u>, 94 F.2d 40, 44–45 (2d Cir. 1996).

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment which is listed in Appendix 1 of the regulations, [t]he [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Barry v. Schweiker, 675 F. 2d 464, 467 (2d Cir.1982).

## III. DISCUSSION

### a. The ALJ Decision

The ALJ concluded that Plaintiff failed to establish that he has an inability to ambulate effectively under Listing 1.00(B)(2)(b). R. at 22.

An inability to ambulate effectively is defined as:

> [A]n extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. § 404, Subpt. P. App. 1 Listing 1.00(B)(2)(b)(1).

It is established that,

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. § 404, Subpt. P. App. 1 Listing 1.00(B)(2)(b)(2).

### b. Scope of Review

Because the ALJ applied the appropriate legal standard, the Court is left only to determine if the ALJ's finding was supported by substantial evidence. See Tejada, 167 F. 3d at 773. "The burden is on the plaintiff to present medical findings which show that his or her impairments match a listing or are equal in severity to a listed impairment." Bull v. Comm'r of Soc. Sec., 2009 WL 799966 (N.D.N.Y. Mar. 25, 2009) (citing Zwick v. Apfel, 1998 WL 426800, at *6 (S.D.N.Y. July 27, 1998)). Furthermore, "[i]n order to show that an impairment meets a Listing, the claimant must show that his or her impairment meets *all* of the specified medical criteria. . . If a claimant's impairment "manifests only some of those criteria, no matter how severely," the impairment does not qualify. Mattison v. Astrue, 2009 WL 3839398 at *5 (N.D.N.Y. Nov. 16, 2009) (citing Sullivan v. Zebley, 493 U.S. 521, 530 (1990); 20 C.F.R. § 404.1525(d)).

### c. Plaintiff's Argument

Plaintiff's objections are contingent on the argument that Plaintiff meets the Listing requirements of 20 C.F.R. § 404, Subpt. P. App. 1 Listings 1.00(B)(2)(b)(2), 1.02(a), and 1.05(B), and as such, does not possess the ability to ambulate effectively. Plaintiff's argument is largely conclusory and fails to make the appropriate citations to the record. Plaintiff states that the facts of this case have been misrepresented, and that the Appeals Council did not evaluate whether the findings of the ALJ "made any sense in the context of the evidence." Pl. Mem. at 3. Plaintiff offers insufficient evidence to substantiate his claims regarding his abilities and does not negate the factual findings of the ALJ.

Plaintiff asserts that much of the time, he is only able to wear his prosthetic for 1-2 hours per day and that he frequently requires the use of a wheelchair. Pl. Mem. at 3. However, Plaintiff points to nothing in the record substantiating these claims, and there is

nothing in the existing record to support them. Thus, the Court finds no reason to discount the record which indicates that Plaintiff wears his prosthetic for 6-8 hours per day. R. at 449.

Plaintiff next objects to the findings that he was able to golf on numerous occasions. Pl. Mem. 3. Plaintiff addresses one of these golf instances in a letter to the Appeals Council by stating, "I didn't have to participate in every hole, it was a charity event and I just wanted to get out of the house and try to have fun with my friends again." R. at 224. Similarly, Plaintiff disputes that he was able to help build a garage. Plaintiff claims that this was taken out of context and that he did not personally build the garage, but was in a wheelchair while family and friends put it up. R. at 224. Plaintiff asserts that some of the activities cited by the ALJ in his determination "are not exactly what they seem." Pl. Mem. at 4. Plaintiff, however, offers insufficient evidence to substantiate his explanations. As such, the Court does not find Plaintiff's assertions sufficient to overcome the available facts and the ALJ's finding of effective ambulation.

Plaintiff claims that although the ALJ found that Plaintiff had benefitted from various therapies and exercises, these findings do not indicate that Plaintiff was no longer encountering problems regarding his amputation. Pl. Mem. 4. This conclusory argument fails. Nowhere in the ALJ's opinion does it state that Plaintiff is suffering any longer. While the Court is sympathetic to Plaintiff's condition, the fact that Plaintiff continues to face medical challenges does not negate the finding of effective ambulation. See Rosado v. Astrue, 713 F. Supp. 2d 347, 359-61 (S.D.N.Y. 2010).

Plaintiff also objects to the ALJ's findings that Plaintiff's ability to take care of his child requires a lot of physical activity. Pl. Mem. 4. Plaintiff's bare assertions do not negate

his own testimony that he is able to cook, do laundry, and participate in other daily household activities. R. at 51-2.

Plaintiff argues that because he personally completed the residual functional capacity assessment, and was not completed by a medical profession, it should not be afforded weight. Pl. Mem. 5. However, an additional residual functional capacity assessment completed by J. Godbey is included in the record. R. at 443. There is nothing indicating that the ALJ solely considered Plaintiff's self assessment when determining Plaintiff's residual functional capacity. Furthermore, the ALJ notes that he underwent a "careful consideration of the entire record" in determining Plaintiff's residual functional capacity. R. at 23. The ALJ found that Plaintiff can lift/carry 20 pounds occasionally, 10 pounds frequently, stand/walk for about 2 hours in an 8 hour work day, and sit for about 6 hours in an 8 hour work day. R. at 23. The ALJ also found that Plaintiff can "occasionally engage in postural activities, including climbing, balancing, bending, stooping, kneeling, crouching, and crawling." R. at 23. Plaintiff does not establish how this finding was erroneous due to consideration of the unsigned and undated residual functional capacity assessment.

Furthermore, in some areas of the self assessment, Plaintiff himself claimed to be as capable or more so than the ALJ found, thereby substantiating the findings of the ALJ.[3] R. at 460.

### d. Substantial Evidence to Support the ALJ's Decision

---

[3] Both Plaintiff and the ALJ opined that Plaintiff can lift/carry 20 pounds occasionally; Plaintiff stated he could frequently lift/carry 25 pounds while the ALJ opined 10 pounds in this category.

Upon review, the Court finds that the ALJ's decision that Plaintiff can ambulate effectively is supported by substantial evidence. As stated above, the an individual has the ability to ambulate when he is "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school." 20 C.F.R. § 404, Subpt. P. App. 1 Listing 1.00(B)(2)(b)(2). An impairment to an individual's ability to walk, without more, does not rise to ineffective ambulation. Dibiasio v. Astrue, 2010 WL 3368429 at*10 (W.D.N.Y. 2010). The fact that an individual prefers or sometimes relies on assistance to move about does not preclude the ALJ from finding that the Plaintiff can ambulate. Sturick v. Astrue, 2012 WL 4866457 at *3 (N.D.N.Y. Oct. 12, 2012) (where although petitioner prefers a scooter, she can walk short distances and go to the store; and a finding of an antalgic gait and an inability to walk prolonged distances does not rise to an extreme limitation in the ability to walk)

The record contains substantial evidence on which the ALJ could make a determination that Plaintiff could ambulate effectively. Plaintiff testified that he is able to go out for a couple hours with the use of his prosthetic and without assistance to meet friends for coffee and lunch. R. at 41, 44, 49. On January 14, 2010, Dr. Kellogg reported that Plaintiff "had been walking more, has been a lot more active including building a garage." R. at 325. Reports from Innovative Physical Therapy Solutions indicate that Plaintiff was able to participate in golfing at least twice. R. at 449, 52. It was also noted that on one occasion, Plaintiff had been on his feet in the garage all day. R. at 451. It was noted that Plaintiff ran errands, and was up painting a window. R. at 452-53. Additionally, it was reported that

Plaintiff wears his prosthetic 6-8 hours a day. R. at 449. On August 18, 2009, Dr. Riley opined that Plaintiff ". . . has begun walking with a prosthetic and is doing well. He continues to require Lortab for occasional pain . . . [h]is incisions are well healed and he is doing well with his prosthetic." R. at 320. Plaintiff also goes shopping and performs daily chores such as cooking and laundry with a wheelchair or motorized scooter. R. at 52.

These facts are sufficient to show that Plaintiff is capable of ambulation. Golfing, painting windows, and working on his garage are all daily activities Plaintiff could perform without assistance. The fact that Plaintiff wears his prosthetic 6-8 hours a day shows that he is capable of wearing the prosthetic for long periods of time, making assistance for ambulation unnecessary. Although he uses a wheelchair or motorized scooter to shop, cook, and do laundry, mere preference for assistance does not on its own show ineffective ambulation. These facts together form substantial evidence on which the ALJ properly relied in determining that Plaintiff could did not meet the ineffective ambulation requirement in the Listing. Thus the ALJ's determination that Plaintiff was not disabled was correct. .

## 2. CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the final decision of the Commissioner.

IT IS SO ORDERED.

Dated: September 5, 2013

Thomas J. McAvoy
Senior, U.S. District Judge